### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ANTOINE CLARK, *et al.*,

             *Defendants.*

CRIMINAL ACTION
NO. 19-00015-1, 2, 4

**PAPPERT, J.**                                                              **September 3, 2020**

### MEMORANDUM

A jury convicted Antoine Clark, Daniel Robinson and Gerald Spruell of a variety of drug crimes. The defendants have filed several post-trial motions, each of which the Court denies.

### I

A grand jury returned an indictment charging Clark, Robinson, Spruell and others with conspiring to distribute 280 grams or more of crack cocaine and 1,000 grams or more of heroin. (Superseding Indictment 2–21, ECF No. 143.) The indictment also charged each defendant with distributing or possessing crack or heroin on specific dates. *See, e.g.*, (*id.* at 22–25). Of the nine persons indicted in the drug-trafficking conspiracy, only Clark, Robinson and Spruell went to trial.

### A

At trial, the government showed how the defendants ran a "drug delivery service" akin to "a pizza delivery service." (Trial Tr., Vol. I, at 15:15–16, ECF No. 386.) A customer would call a phone—dubbed "the 4400 phone"—order crack or heroin and arrange a place to meet. (*Id.* at 15:17.) Clark, Robinson, Spruell or another conspirator would then "drive to the location and deliver the drugs." (*Id.* at 15:20–21.) To keep the

business running nonstop, "the Defendants staffed the 4400 phone in shifts.". (*Id.* at 15:17–22.) The person with the phone "would take orders and make drug deliveries" and then "pass the phone onto the next Defendant." (*Id.* at 15:25–16:3.)

Though they put the government to its burden of proof on all counts, the defendants in many instances did not deny that they sold drugs. *See, e.g.*, (*id.* at 23:5–10, 29:7–9); (*id.*, Vol. IX, at 58:5–7, 67:9–12, 95:20–22, ECF No. 394). But they disputed the government's theory that they conspired together to distribute drugs. *See, e.g.*, (*id.* at 53:3–5, 86:18–19). Playing on the government's pizza analogy, the defendants compared themselves to Uber drivers working independently rather than as members of a single distribution system. *See, e.g.*, (*id.* at 88:3–90:14). And even if a conspiracy did exist, the defendants argued, the government could not prove beyond a reasonable doubt that it involved at least 280 grams of crack cocaine and 1,000 grams of heroin. *See, e.g.*, (*id.* at 86:8–12).

1

The jury heard eight days of evidence.[1] Over the first few days, FBI agents recounted the more than twenty controlled drug buys they arranged with the defendants through the 4400 phone. *See, e.g.*, (*id.*, Vol. I, at 69:13–87:23). For each buy, the government introduced audio or video recordings, laboratory reports, property receipts, physical drugs or surveillance photographs to support the agents' testimony. *See, e.g.*, (*id.*); (Gov't Exs. 16-5, 16-6, 16-8, 16-9). In total, the government recovered about sixty-four grams of crack and nine grams of heroin from these controlled buys.

---

[1] Unless specifically noted otherwise, all testimony and evidence discussed in this section were admitted without objection either before or during trial. *See* Fed. R. Evid. 103(a) (discussing how to preserve a claim of error in the admission or exclusion of evidence).

*See* (Gov't First Resp. 9, ECF No. 426); *see also* (Trial Tr., Vol. VI, at 138:23–157:9, ECF No. 391) (stipulation as to weights and identity of most of the seized drugs).

On the fourth day of trial, Christopher Verticelli, a co-defendant who had pleaded guilty, testified.  He told the jury that he "continuously called" the 4400 phone to buy crack and heroin from the defendants.  (*Id.*, Vol. IV, at 146:6, ECF No. 389.)  Almost every day, Verticelli recalled, he bought "10 rocks of crack cocaine and 3 to 5 bundles of heroin."  (*Id.* at 146:10–11.)  Expressed as weights, Verticelli's near-daily order came to about two grams of crack and more than a gram of heroin.  *See* (*id.* at 188:4–6); (*id.*, Vol. VIII, at 28:22–31:1, 32:22–33:22, ECF No. 393).  Phone records, government surveillance and Verticelli's testimony suggested that he bought at least 276 grams of crack and 173 grams of heroin from the defendants in a seven-month period.  *See* (*id.*, Vol. V, at 81:25–82:5, ECF No. 390); (*id.*, Vol. IX, at 39:24–40:15).  Evidence of other high-volume customers showed that Verticelli's experience was not unique.  *See, e.g.*, (*id.*, Vol. V, at 71:4–73:12, 75:19–89:18).

Verticelli also detailed how the defendants' drug delivery service worked.  As he recalled, he "could always call [the 4400 phone], and they would always be around."  (*Id.*, Vol. IV, at 153:12–13.)  Depending on the time of day, the person who answered the phone would vary, Verticelli recounted.  *See* (*id.* at 153:14–154:10).  That said, he remembered that Clark usually worked mornings, Robinson nights and Spruell some of both.  *See* (*id.* at 154:20–155:8).  But no matter who was working, someone "pretty much always answered."  (*Id.* at 153:24.)

Throughout the trial, the government presented the evidence gathered from a pen register and wiretap of the 4400 phone.  For example, FBI Special Agent Charles

Simpson, the lead investigator, told jurors about the "shocking" number of calls the 4400 phone received each day. (*Id.*, Vol. V, at 54:1.) The wiretap showed more of the same; it captured over 8,000 phone calls, nearly all of which concerned a drug sale. *See* (*id.* at 191:21–22); (*id.*, Vol. VIII, at 116:10–15). Having listened to each call "multiple times," (*id.*, Vol. V, at 191:25), Simpson identified Clark as the speaker on about 23%, Robinson around 18% and Spruell roughly 17% of the calls, *see* (*id.* at 192:22–193:22); (Gov't Ex. 39A-15). The jury listened to over 100 of these recordings. *See, e.g.*, (Trial Tr., Vol. V, at 183:16–184:5); (Gov't Ex. 54-1). Though most calls involved relatively small quantities of drugs, *see, e.g.*, (Gov't Ex. 70-1); (Trial Tr., Vol. VI, at 55:3–56:11), a series of recordings showed the defendants working together to buy fifty-six grams of cocaine to convert into crack, *see* (*id.*, Vol. V, at 196:6–229:3); (*id.*, Vol. VI, at 37:13–41:11); (Gov't Exs. 64-1–14).

Simpson summarized the evidence gleaned from the wiretap. *See* (Trial Tr., Vol. VIII, at 114:19–133:18, 138:12–169:5). Given the volume of material, Simpson limited his analysis to forty "shifts" from the six weeks the wiretap was active. *See* (*id.* at 115:4–10). He defined a "shift" as the period one person worked the 4400 phone before handing it off to another person. *See* (*id.* at 115:17–23). To determine when one shift ended and another began, Simpson listened for when the voice answering the 4400 phone changed and cross-checked the audio against photo surveillance, text messages and other evidence. *See* (*id.* at 115:17–116:2). He then selected forty shifts that reflected the defendants' typical practices—that is, he included short and long shifts. *See* (*id.* at 140:24–141:8).

For these forty shifts, Simpson listened to every call and recorded "the amount of

drugs that were being sold." (*Id.* at 115:9.)  His assessments of the quantities sold erred

on the conservative side.  Determining the amounts was simple if a caller asked for

three bags of crack; he simply "noted that drug and that amount." (*Id.* at 118:14.)  But

if a caller asked for crack without specifying the quantity, Simpson assumed the sale

was for just one bag of crack.  *See* (*id.* at 119:5–10).  When a caller asked for multiple

bags but did not name a definite quantity, Simpson treated it as a sale of two bags.  *See*

(*id.*).  And if a caller did not say which drug he wanted, Simpson alternated recording

crack and heroin.  *See* (*id.* at 120:11–121:4).  Over no objections, the Court admitted

into evidence Simpson's notes identifying the type and weight of the drugs sold on each

shift.  *See* (*id.* at 127:7–12); (Gov't. Ex. 119-1).

The defendants did, however, object to a key part of Simpson's testimony.  *See*

(Trial Tr., Vol. VIII, at 135:16–137:14).  They argued that Simpson lacked foundation

for his methodology of identifying drug type and weight "when he couldn't tell what

transpired" from the recordings.  (*Id.* at 135:17–18.)  So the testimony regarding sales

for which the recordings did not specify a drug and quantity should have been "stricken

as speculative," the defendant reasoned.[2]  (*Id.* at 135:21.)  In response, the government

argued that it had laid a sufficient foundation by playing over 100 calls showing the

jury "what happens when these calls are made." (*Id.* at 136:15.)  The government

added that it was "up to the jury to decide ultimately whether [to] credit Agent

Simpson." (*Id.* at 136:16–17.)  The Court agreed with the government, overruling the

objection and noting that the defendants were free to challenge Simpson's credibility

and the accuracy of his assumptions during cross-examination.  (*Id.* at 136:22–137:6.)

---

[2]     By objecting on this limited basis, the defendants forfeited all other objections to Simpson's
testimony and the accompanying exhibits 119-1 and 119-2.  *See* Fed. R. Evid. 103(a).

When testimony resumed, Simpson ran through the drug quantities he determined the defendants sold during each shift. *See* (*id.* at 138:12–141:10). By his calculations, the defendants sold 257.3 grams of crack and 69.42 grams of heroin over the forty shifts he reviewed. *See* (*id.* at 154:24–155:4). On a per-shift basis, this amounted to just under 6.5 grams of crack and about 1.7 grams of heroin. *See* (*id.* at 155:5–17). Using these figures, Simpson extrapolated that the defendants sold about 180 grams of crack and almost fifty grams of heroin per week. *See* (*id.* at 161:1–5). For the six-week life of the wiretap, then, Simpson opined that the defendants sold over 1,000 grams of crack and 290 grams of heroin. *See* (*id.* at 162:2–6). Applying these calculations to the life of the conspiracy, Simpson surmised that the defendants sold over 17,000 grams of crack and at least 4,500 grams of heroin. *See* (*id.* at 162:10–169:4). To help the jury follow this testimony, the government introduced, with no defense objection, an exhibit showing Simpson's calculations and estimates. *See* (154:13–16); (Gov't Ex. 119-2).

The defendants vigorously cross-examined Simpson. *See* (Trial Tr., Vol. VIII, at 169:12–214:21). They challenged whether forty shifts were representative of a conspiracy lasting several years. *See* (*id.* at 169:21–171:22). They implied that Simpson may have used longer-than-average shifts in his analysis. *See* (*id.* at 172:17–174:16). They emphasized for the jury that the wiretap was active for just six weeks, so Simpson could not say for certain what volume of sales occurred during the rest of the alleged conspiracy. *See* (*id.* at 174:17–175:18). They probed the soundness of Simpson's decisions to alternate evenly between crack and heroin when assigning a drug type to an indeterminate sale. *See* (*id.* at 192:2–195:6). They pressed Simpson on whether his

6

methodology was truly as conservative as he presented it to be.  *See* (*id.* at 198:13–199:16).  And they doubted that the defendants' modest lifestyles fit with the scale of the drug trafficking operation Simpson's testimony supported.  *See* (*id.* at 201:6–214:21).

2

After the government rested its case, the defendants moved for acquittal on the conspiracy charge.  *See* (*id.* at 258:19–259:2); (Defs.' First Mot. for Acquittal, ECF No. 320).  Relying on *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019), the defendants argued that the government could not aggregate separate drug sales to prove that they conspired to distribute at least 280 grams of crack and 1,000 grams of heroin.  *See* (*id.* at 1–4).  In the alternative, they claimed that there was "a fatal variance in the Indictment."  (*Id.* at 6.)  The *Rowe* and variance theories were the only bases for acquittal the defendants offered.  *See* (*id.*); (Trial Tr., Vol. VIII, at 258:19–279:24).  Though the Court expressed skepticism, it took the motion "under advisement."  (*Id.* at 279:21.)

In the meantime, the parties delivered closing statements and the jury retired to deliberate.  After deliberating for more than a day, the jury found each defendant guilty of conspiring to distribute 280 grams or more of crack cocaine and 1,000 grams or more of heroin.  *See* (Jury Verdict Forms, EFC Nos. 329, 330, 331).  The jury also found each defendant guilty on the individual distribution and possession charges.  *See* (*id.* at 2–5).

B

The Court set April 24 as the deadline for post-trial motions.  *See* (Trial Tr., Vol. X, at 68:16–19, ECF No. 395); (First Deadline Order, ECF No. 327).  The Court later extended the deadline to June 29 to accommodate difficulties associated with the onset

7

of COVID-19.  (Second Deadline Order, ECF No. 354.)  A few days before the June deadline, the Court granted Robinson's request for another thirty days.  *See* (Robinson Mot. for Extension, ECF No. 375); (Order Granting Setting Robinson Mot. for Extension, ECF No. 376).  Neither Clark nor Spruell joined in Robinson's request or sought an extension of his own.

Robinson filed two timely post-trial motions.  *See* (Robinson Mot. for Acquittal, ECF No. 412); (Robinson Mot. for New Trial, ECF No. 413).  In the first, he argues that the government failed to present sufficient evidence to convict him on the conspiracy charge or on four of the individual distribution charges.  *See* (Robinson Mot. for Acquittal 4).  In his second motion, Robinson reiterates that the jury's verdict on the conspiracy charge ran contrary to the evidence, and he argues that evidentiary errors infected the jury's deliberations.  *See* (Robinson Mot. for New Trial 19–22).

Only after Robinson's deadline had lapsed did Clark and Spruell try to join Robinson's motion for a new trial.[3]  *See* (Mots. for Joinder, ECF Nos. 414, 425).  A week or so later, Spruell filed two motions for acquittal—one by counsel and one *pro se*.  *See* (Spruell First Mot. for Acquittal, ECF No. 424); (Spruell Pro Se Mot. for Acquittal, ECF No. 429).

## II

### A

Rule 29 of the Federal Rules of Criminal Procedure provides that a court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Evidence is

---

[3]     To the extent these motions for joinder could somehow be considered timely, the Court could have granted them and then rejected the arguments they adopted.  But because the Court denies Robinson's motion, it denies them as moot.

insufficient if no "rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). This standard is "highly deferential." *Id.* It requires courts to view the entire record—not just isolated parts—"in the light most favorable to the prosecution." *Id.* (quoting *Brodie*, 403 F.3d at 133). Courts "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Id.* (ellipsis omitted) (quoting *Brodie*, 403 F.3d at 133). And to avoid "act[ing] as a thirteenth juror," a court must uphold any verdict that "does not 'fall below the threshold of bare rationality.'" *Id.* at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)).

## B

A more deferential standard of review applies to motions for a new trial under Rule 33. That rule permits district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts need "not view the evidence favorably to the Government," *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). That said, Rule 33 motions are "disfavored and should be 'granted sparingly and only in exceptional cases.'" *Id.* (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). For example, a court may "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quoting *Johnson*, 302 F.3d at 150). And a court may grant a new trial to cure an error

at trial only if the defendant proves that the error (or errors) "had a substantial influence on the outcome of the trial." *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).

## III

### A

At the close of the government's case, the defendants moved for acquittal on the conspiracy charge on two bases. *See* (Defs.' First Mot. for Acquittal). They first argued that *Rowe* barred the government from aggregating separate drug sales to get to 280 grams of crack and 1,000 grams of heroin. *See* (*id.* at 1–6). And because the government could not point to any single sale involving those amounts, the defendants reasoned that they must be acquitted. *See* (*id.*) Alternatively, they claimed that there was "a fatal variance in the Indictment," which led to the same result. (*Id.* at 6.) Having reserved judgment, *see* (Trial Tr., Vol. VIII, at 279:21), the Court now rejects both arguments.

### 1

To start, *Rowe* is inapposite. Charged with selling 1,000 grams of heroin, the defendant there conceded that he had sold about 200 grams. *See* 919 F.3d at 756. To get to 1,000 grams, the government elicited testimony from an informant and a Drug Enforcement Administration agent; it also proffered a notebook recovered from the defendant during his arrest. *See id.* at 757. But none of this evidence suggested that the defendant ever sold 1,000 grams or more in a single transaction. *See id.* at 757–58. This was a problem, the Third Circuit reasoned, because "separate acts of distribution of controlled substances are distinct offenses . . . , as opposed to a continuing crime." *Id.* at 759 (quotation omitted). Seeing no evidence of a sale exceeding 1,000 grams, the

Court of Appeals vacated the defendant's conviction.  *See id.* at 761.

Here, the government charged the defendants with conspiring to distribute

drugs—in addition to distributing and possessing with the intent to distribute.  *See*

(Superseding Indictment 2–21).  Conspiracy, unlike the crimes involved in *Rowe*, "is a

continuing offense."  *Smith v. United States*, 568 U.S. 106, 111 (2013).  As a result, each

defendant is responsible for "the entire quantity of drugs that pass[es] through the

conspiracy."  *United States v. Gibbs*, 190 F.3d 188, 215 (3d Cir. 1999).  And in

calculating that amount, the jury (or court at sentencing) may "aggregate multiple drug

transactions."[4]  *United States v. Gori*, 324 F.3d 234, 237 (3d Cir. 2003).  *Rowe* did not

upset that basic tenet of conspiracy law.  *See Britt v. United States*, No. CV 18-16357

(PGS), 2020 WL 3249118, at *11 (D.N.J. June 16, 2020) (reaching the same conclusion);

*United States v. Kendrick*, No. CR 17-143-4, 2019 WL 2248631, at *1–2 (W.D. Pa. May

17, 2019) (same); *United States v. Perin*, No. 2:14-CR-205-2, 2019 WL 3997418, at *4

(W.D. Pa. Aug. 23, 2019) (same).

2

Nor is there "a fatal variance in the Indictment."  (Defs.' First Mot. for Acquittal

at 6.)  The defendants claim that the evidence at trial revealed many separate

---

[4]      *See also United States v. Yellow Horse*, 774 F.3d 493 (8th Cir. 2014) ("When calculating drug
quantity in the context of a narcotics trafficking conspiracy, the sentencing court may consider all
transactions known or reasonably foreseeable to the defendant that were made in furtherance of the
conspiracy." (quotation omitted)); *United States v. Ramirez-Negron*, 751 F.3d 42, 53–54 (1st Cir.
2014) (affirming sentence for conspiracy to distribute crack based on aggregation of individual sales);
*United States v. Law*, 528 F.3d 888, 906 (D.C. Cir. 2008) ("Here, the conspiracy was dealing drugs,
and thus the entire sum of the drugs within the conspiracy constituted a single conspiracy violation.
Accordingly, the district court did not commit plain error by relying on the jury's aggregated drug
quantity determination . . . ."); *United States v. Pressley*, 469 F.3d 63, 65–67 (2d Cir. 2006) (holding
that "the District Court properly aggregated all the drug transactions attributable to [the defendant]
throughout the 11-year scheme"); *United States v. Turner*, 319 F.3d 716, 723–24 (5th Cir. 2003)
(affirming conviction for conspiracy to distribute five kilograms of cocaine even though the defendant
"dealt in one-kilogram quantities only").

conspiracies to distribute drugs.  *See* (*id.* at 6–7).  But the indictment charged them with a single, overarching conspiracy run through the 4400 phone.  That discrepancy, the defendants reason, constitutes a fatal variance.  *See* (*id.*)

No variance exists if, "viewing the evidence in the light most favorable to the government, a rational trier of fact could have concluded from the proof adduced at trial the existence of the single conspiracy alleged in the indictment."  *United States v. Greenridge*, 495 F.3d 85, 93 (3d Cir. 2007) (citation omitted).  To determine if one or multiple conspiracies exist, courts first "examine whether there was a common goal among the conspirators."  *Id.* (quoting *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989)).  They next "look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators."  *Id.* (quoting *Kelly*, 892 F.2d at 259).  Finally, courts asses "the extent to which the participants overlap in the various dealings."  *Id.* (quoting *Kelly*, 892 F.2d at 259).

A rational jury could conclude that the defendants operated a single conspiracy. The evidence showed that the defendants shared the common goal of distributing as much crack and heroin as they could through the 4400 phone.  *See, e.g.*, (Trial Tr., Vol. V, at 196:6–229:3); (*id.*, Vol. VI, at 37:13–41:11); (Gov't Exs. 64-1–14).  Though they often worked independently, the defendants were bound together through the 4400 phone, which they passed from one to the other to coordinate sales and resupply efforts. *Cf. United States v. Adams*, 759 F.2d 1099, 1109–10 (3d Cir. 1985) (holding no variance existed for scheme run from a single physical location).  This conspiracy could not have continued without the defendants' continued cooperation.  As Clark himself noted, the

defendants "do shifts" on the 4400, (Gov't Ex. 39A-1), and could not maintain the stream of drugs sold using that phone unless they all took their turn, *see* (Trial Tr., Vol. IV, at 153:12–13). And the defendants' activities significantly overlapped; for instance, they banded together to replenish their supply of crack. *See* (*id.*, Vol. V, at 196:6– 229:3); (*id.*, Vol. VI, at 37:13–41:11); (Gov't Exs. 64-1–14). Because the evidence supports a finding that a single conspiracy existed, there was no variance in the indictment.

B

1

In his Motion for Acquittal, Robinson challenges his conviction for conspiring to distribute at least 280 grams of crack and 1,000 grams of heroin. *See* (Robinson Mot. for Acquittal 4–17). He does not deny that the evidence showed that he conspired to distribute crack and heroin. *See, e.g.*, (*id.* at 4–5) (taking as a given that a conspiracy existed). Rather, Robinson claims that the government failed to prove that the conspiracy involved at least 280 grams of crack and 1,000 grams of heroin. *See* (*id.* at 20–21). The only evidence suggesting these significant quantities, Robinson argues, was Simpson's shift-review testimony and the accompanying exhibits. *See* (*id.* at 5–17). But that evidence, he posits, was so flawed and so speculative that no reasonable juror could convict him on those quantities. *See* (*id.*)

Even without Simpson's shift-review testimony, there was ample evidence supporting the jury's verdict on the conspiracy charge. The jury heard hundreds of recordings showing Robinson and others selling drugs. *See, e.g.*, (Trial Tr., Vol. V, at 183:16–184:5); (Gov't Ex. 54-1). Special Agent Simpson's uncontradicted testimony established that nearly all of the 8,000 plus intercepted calls to the 4400 phone involved

13

a drug sale.  *See* (Trial Tr., Vol. V, at 191:21–22); (*id.*, Vol. VIII, at 116:10–15).  The pen-register evidence revealed a "shocking" number of additional calls to the phone, which a rational juror could infer also concerned drug sales.  (*Id.*, Vol. V, at 54:1.)  The same juror could find that Verticelli alone bought at least 276 grams of crack and 173 grams of heroin from the defendants over about seven months.  *See* (*id.* at 81:25–82:5); (*id.*, Vol. IX, at 39:24–40:15).  And Verticelli was not the defendants' only high-volume customer.  *See* (*id.*, Vol. V, at 71:4–73:12, 75:19–89:18).  From just twenty or so controlled buys, the government recovered about sixty-four grams of crack and nine grams of heroin.  *See* (Gov't First Resp. 9); (Trial Tr., Vol. VI, at 138:23–157:9).  Given all this evidence, it would hardly "fall below the threshold of bare rationality" to conclude that the conspiracy involved at least 280 grams of crack and 1,000 grams of heroin.  *Coleman*, 566 U.S. at 656.

In arguing otherwise, Robinson invokes *United States v. Pauling*, 256 F. Supp. 3d Cir. 329 (S.D.N.Y. 2017).  The defendant there was convicted of conspiring to distribute at least 100 grams of heroin.  *Id.* at 333.  At trial, the government could account for just eighty-nine grams.  *Id.* at 337.  To bridge the gap, the government relied on a wiretap recording on which a customer asked for the "same thing as last time" when buying fourteen grams of heroin.  *Id.*  The government asked the jury to infer from this comment that the customer had previously ordered another fourteen grams.  *See id.*  But the only evidence of a prior sale to this customer showed him buying "only a single gram."  *Id.*  At bottom, the government tried "to fabricate transactions of which there is no evidence."  *Id.* at 338 (quoting *United States v. Hickman*, 626 F.3d 756, 769 (4th Cir. 2010).  That was a step too far for the district

14

court, which granted the defendant's Rule 29 motion.  *See id.*

*Pauling* is inapposite.  The jury here heard hundreds of recorded drug transactions, learned of at least twenty controlled buys and listened to a repeat customer describe the near-constant flow of drugs through the 4400 phone—a flow that the government proved lasted for several years.  *See, e.g.*, (Trial Tr., Vol. I, at 45:19–23); (*id.*, Vol. V, at 55:7–8, 112:5–7, 203:6–15); (*id.*, Vol. VI, at 159:20–25, 243:13–16). Unlike in *Pauling*, the government had no need to fabricate transactions; there were thousands to choose from.  That the government did not play every recording or pile kilograms of drugs in front of the jury is of no moment.  After all, "in calculating the amounts involved in drug transactions, some degree of estimation must be permitted." *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992) (noting this necessity in context of sentencing).  And relatively little estimation was necessary here, because the government laid a solid evidentiary foundation—even without Simpson's shift review— for the jury to find that the defendants conspired to sell at least 280 grams of crack and 1,000 grams of heroin.

Simpson's shift review tied together and confirmed what the underlying evidence had already established.  Simpson explained his methodology—and its limitations—at length.  *See* (Trial Tr., Vol. VIII, at 114:19–133:18, 138:12–169:5, 169:12–214:21).  The government laid the foundation for this testimony by playing over 100 calls for the jury and showing how the defendants' distribution system worked over the course of several years.  *See, e.g.*, (*id.*, Vol. V, at 155:7–8, 112:5–7, 83:16–184:5, 203:6–15).  It was up to the jury to decide whether to credit Simpson's testimony.  *See United States v. Tyler*, 956 F.3d 116, 122–23 (3d Cir. 2020); *United States v. Salahuddin*, 756 F.3d 329, 348–49

(3d Cir. 2014).  The defendants had their chance to undermine that testimony through cross-examination.  *See* (Trial Tr., Vol. VIII, at 169:12–214:21).  That the jury apparently credited Simpson's shift review is no basis for acquittal under Rule 29.  *Cf. United States v. Bey*, No. CR 17-208-1, 2019 WL 1236057, at *4–7 (E.D. Pa. Jan. 24, 2019).

2

Robinson also challenges the sufficiency of the evidence used to convicted him of four individual distribution charges—Counts 11, 12, 50 and 53.  *See* (Robinson Mot. for Acquittal 18–19).  Count 11 charged Robinson with distributing less than one gram of heroin and under five grams of crack on November 13, 2014.  (Superseding Indictment 31.)  Testimony at trial recounted how an FBI informant bought fourteen bags of heroin and one bag of crack from Robinson that day.  *See* (Trial Tr., Vol. I, at 152:15–169:16, 210:24–211:1).  FBI reports, property receipts, audio recordings and the physical drugs themselves, among other evidence, corroborated this testimony.  *See* (Gov't Exs. 26-8, 26-8P, 26-12).  On top of this, the parties stipulated that a laboratory analysis showed that the heroin recovered from the controlled buy was indeed heroin.  *See* (Trial Tr., Vol. VI, at 143:12–22).  Though the stipulation did not cover the crack, Robinson never suggested that the substance the jury saw was anything other than crack cocaine.  *See* (*id.* Vol. I, at 152:15–169:16, 210:24–211:1).  And the jury had ample evidence from which to infer that all drugs involved were genuine.  *See, e.g.*, (*id.* Vol. VI, at 139:2–157:9, 227:12–229:6).  Thus, Robinson's argument that "no reasonable jury could have convicted him of distributing crack on November 13, 2014," founders.  (Robinson Mot. for Acquittal 18); *see Griffin v. Spratt*, 969 F.2d 16, 22 n.2 (3d Cir. 1992) (Alito, J.) ("Identification of a controlled substance does not require direct evidence if available

circumstantial evidence establishes its identity beyond a reasonable doubt." (quotation omitted)); *see also United States v. Sanapaw*, 366 F.3d 492, 496 (7th Cir. 2004) ("[N]either expert testimony nor a chemical test of the substance sold is required to prove distribution of a controlled substance.")

It is a similar story with Counts 50 and 53. Both counts charged Robinson with distributing crack on specific dates. *See* (Superseding Indictment 70, 73). On Count 50, the jury heard a recording on which Robinson arranged a drug sale. *See* (Trial Tr., Vol. VI, at 60:1–23). FBI surveillance confirmed that Robinson met the buyer and completed the transaction. *See* (*id.* at 60:25–61:25). And a Philadelphia police officer testified that he arrested the customer and recovered a packet of crack. *See* (*id.*, Vol. VIII, at 111:15–113:6). With respect to Count 53, a recording again showed Robinson arranging a drug sale, surveillance captured Robinson at the sale and a vehicle stop of the customer recovered crack. *See* (*id.*, Vol. VI, at 81:14–88:8). Despite this evidence, Robinson claims no reasonable jury could have convicted him of distributing crack because there was no laboratory report proving that the substances sold were crack. *See* (Robinson Mot. for Acquittal 19). As noted, the jury had every reason to believe that the substances were crack and no reason to think otherwise. That the government did not introduce a chemical analysis does not undermine Robinson's conviction. *See Griffin*, 969 F.2d at 22 n.2; *Sanapaw*, 366 F.3d at 496.

Robinson's argument on Count 12 is equally meritless. Though it charged him with distributing both crack and marijuana on a certain date, (Superseding Indictment 32), the government did not seek a conviction on the marijuana portion, *see* (Verdict Sheet 3, ECF No. 331). Thus, Robinson's complaint that "no reasonable jury could have

convicted him of distributing marijuana" is irrelevant because no jury in fact convicted him of doing so.  (Robinson Mot. for Acquittal 18.)

C

Robinson also moves for a new trial.  His argument is two-fold.  First, he claims that Simpson's shift review was so flawed that it led the jury to the unsupported conclusion that the conspiracy involved at least 280 grams of crack and 1,000 grams of heroin.  *See* (Robinson Mot. for New Trial 20).  Second, Robinson argues that he Court erred by even allowing the shift-review testimony and admitting the accompanying exhibits.  *See* (*id.* at 20–22).

1

The first argument retreads old ground.  As noted earlier, Simpson explained his methodology—and its limitations—at length.  *See* (Trial Tr., Vol. VIII, at 114:19–133:18, 138:12–169:5, 169:12–214:21).  An avalanche of evidence supported his key assumptions.  For instance, Verticelli's testimony, the pen register and other evidence bolstered the premise that the drug activity on the 4400 phone was consistent over the conspiracy.  *See* (*id.*, Vol. IV, at 146:4–11, 149:14–16, 153:12–24, 243:13–16); (*id.*, Vol. V, at 55:7–8, 112:5–7, 203:6–15).  The scores of recordings played for the jury laid the foundation for Simpson's basic method of tracking drug sales by listening to the calls. *See, e.g.*, (*id.* at 183:16–184:5).  Independent FBI surveillance augmented Simpson's conclusions as to when one shift ended and another began.  *See* (*id.*, Vol. VIII, at 115:17–116:2).  Simpson's personal knowledge—having listened to every call—allowed him to testify that nearly all 8,000 calls captured by the wiretap concerned a drug sale. *See* (*id.* at 116:10–15); (*id.*, Vol. V, at 191:21–22).  The quantities recovered from the twenty or so controlled buys comported with the quantities in Simpson's notes.  *See* (*id.*,

18

Vol. VI, at 138:23–157:9). Simply put, the shift review had a solid basis in the evidence.

That the defendants claim that their independent, after-the-fact review of the recordings conflicts at points with Simpson's is immaterial. *See* (Robinson Mot. for New Trial 5–19). They had every opportunity at trial to challenge Simpson's credibility and his assumptions; indeed, they did so at length. *See* (Trial Tr., Vol. VIII, at 169:12–214:21). All the supposed flaws they now identify were fodder for cross-examination. *See* (Gov't First Resp. 15 n.9) (attesting that Simpson's notes and the underlying recordings were produced during discovery). Yet the defendants elected not to raise (or put greater emphasis on) these points at trial. They do not get a do-over just because that choice did not pay off.

Whatever the defendants might think of Simpson's shift review, there is "no serious danger that a miscarriage of justice has occurred." *Salahuddin*, 765 F.3d at 346 (quoting *Johnson*, 302 F.3d at 150). Say the defendants are correct that Simpson's analysis is inflated by twenty-five, fifty or even seventy-five percent. *See* (Robinson Mot. for New Trial 5–19). Even then, the conspiracy would have involved at least 4,250 grams of crack and 1,125 grams of heroin. *See* (Trial Tr., Vol. VIII, at 162:10–169:4); (*id.*, Vol. IX, at 38:22–39:23). Or scrap the shift review entirely and the jury still had enough evidence to find beyond a reasonable doubt that the defendants conspired to distribute at least 280 grams of crack and 1,000 grams of heroin. *See supra* at 14–16.

2

Robinson next claims that the Court erred in allowing Simpson's shift-review testimony and admitting the accompanying exhibits. *See* (Robinson Mot. for New Trial 20–22). For starters, he reasons, Simpson's methodology was so speculative as to mandate its exclusion. *See* (*id.* at 20). He also argues—for the first time—that

"Simpson's testimony was inadmissible lay witness testimony." (*Id.*)  Either way, Robinson concludes, these errors "so infected the jury's deliberations that they had a substantial influence on the outcome of the trial." (*Id.* at 19) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).

The shift review and accompanying exhibits were properly allowed into evidence. Again, Simpson's testimony was not unduly speculative or lacking in foundation. *See supra*, at 14–16; *cf. Bey*, 2019 WL 1236057, at *4–7, *11–12.  Nor did that testimony (or the exhibits) constitute improper lay opinion testimony.  A lay witness may opine on topics "rationally based on the witness's perception" if doing so helps the jury understand his testimony or resolve "a fact in issue" and is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Simpson's testimony (and the exhibits) satisfy each criterion.  He based his opinions on his perception in listening to every recorded call, his experience as an FBI agent, his past encounters with the defendants and his vast knowledge of the defendants' distribution system. *See, e.g.*, (Trial Tr., Vol. I, at 40:13–17); (*id.*, Vol. III, at 152:13–18); (*id.*, Vol. V, at 192:22–193:22, 212:4–6); (*id.*, Vol. VIII, at 121:13–17, 125:19–23, 198:25–199:3, 203:16–18); *cf. United States v. Savage*, --- F.3d ----, No. 14-9003, 2020 WL 4691500, at *48 (3d Cir. Aug. 11, 2020).  His opinions and the exhibits helped the jury contextualize other testimony, such as Verticelli's, and assess the scope of the defendants' conspiracy as reflected by the mountain of recorded calls.  Likewise, Simpson's opinions did not usurp the jury's role as factfinder. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); *cf. United States v. Holovacko*, 781 F. App'x 100, 103–05 (3d Cir. 2019) (unpublished).

C

Spruell has filed two motions for acquittal—one through counsel, another *pro se*. *See* (ECF Nos. 424, 429).  Both motions are untimely.  *See* (Second Deadline Order 1) (setting deadline at June 29, 2020).  And neither motion offers good cause for the missed deadline.  *See* Fed. R. Crim. P. 45(b).

The question is whether the Court has jurisdiction to consider Spruell's untimely motions.  *See Guerra v. Consolidated Rail Corp.*, 936 F.3d 124, 132 (3d Cir. 2019). Some time limits are jurisdictional and others are so-called "claim-processing rules." *Eberhart v. United States*, 546 U.S. 12, 13 (2005) (per curiam).  The difference between the two is "critical."  *Id.* (quoting *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004)).  The former "can never be waived or forfeited."  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). By contrast, "properly invoked" claim-processing rules "must be enforced, but they may be waived or forfeited."  *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. ----, 138 S. Ct. 13, 17 (2017).  And for courts, whether a motion violates a jurisdictional or claim-processing rule determines whether it must be dismissed for lack of jurisdiction or merely denied.  *See, e.g.*, *United States v. Kalb*, 891 F.3d 455, 457 (3d Cir. 2018).

Distinguishing jurisdictional from claim-processing rules is, in theory, simple. "If the Legislature clearly states that a [rule] count[s] as jurisdictional," then it is jurisdictional.  *Fort Bend Cty. v. Davis*, 587 U.S. ----, 139 S. Ct. 1843, 1850 (2019) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006)).  And if "Congress does not rank a [rule] as jurisdictional, courts should treat the restriction as nonjurisdictional." *Fort Bend*, 139 S. Ct. at 1850 (quoting *Arbaugh*, 546 U.S. at 515–16).

Rule 29 falls on the claim-processing side of the line.  Nothing in the rule indicates that Congress intended its time limits to be jurisdictional.  *See* Fed. R. Crim.

P. 29(c).  Indeed, a 2005 amendment to Rule 45 deleted language barring courts from extending "the time to take any action under Rules 29 [and] 33."  Fed. R. Crim. P. 45(b)(2) (2004).  That amendment, the advisory committee remarked, empowered defendants to "seek an extension of time to file" a Rule 29 (or Rule 33) motion.  Fed. R. Crim. P. 45(b)(2) advisory committee's note to 2005 amendment.  Also, under the revised Rule 45, a court may, "on its own," extend the deadline a Rule 29 motion.  Fed. R. Crim. P. 45(b)(1).  That a court may *sua sponte* or on a party's motion extend Rule 29's deadlines shows that those deadlines are not jurisdictional.  Rule 45 aside, the Supreme Court has specifically noted that "Rule 33, like Rule 29 . . . , is a claim-processing rule."  *Eberhart*, 546 U.S. at 19.  Taken together, Rule 29's text, Rule 45(b)(2)'s effect and *Eberhart*'s dictum all point to Rule 29 being a claim-processing rule.[5]

Third Circuit precedent is not to the contrary.  In *United States v. Knight*, 700 F.3d 59 (3d Cir. 2012), the Court of Appeals considered whether "the District Court erred in denying [the defendant's] motion for acquittal."  700 F.3d at 64.  The district court had denied the motion as untimely without mentioning jurisdiction.  *See United States v. Knight*, No. 1:09-CR-00005, 2011 WL 703924, at *4–5 (D.V.I. Feb. 18, 2011).  In affirming, the Third Circuit noted that "[a] district court has no jurisdiction . . . to

---

[5]      *See United States v. Smith*, 467 F.3d 785, 788 (D.C. Cir. 2006) (describing *Eberhart* as holding "that the time limit on Rules 29, 33, 34 and 35 . . . [was] no more than a claim-processing rule"); *see also United States v. Zertuche*, 565 F. App'x 377, 381 n.3 (6th Cir. 2014) (treating Rule 29(c)'s time limit "as a mandatory claims-processing rule") (unpublished); *United States v. White*, 597 F. Supp. 2d 1269, 1278 (M.D. Ala. 2009) ("*Eberhart* . . . makes clear that Rule 29 is not jurisdictional . . . ."); *United States v. Alexander*, 436 F. Supp. 2d 190, 193 n.5 (D. Me. 2006) ("Recent Supreme Court case law clarified that Rules 29 and 33 are 'inflexible claim-processing rule[s]' . . . ." (quoting *Eberhart*, 546 U.S. at 14); *United States v. Cunningham*, No. CR 05-601-02, 2006 WL 8446206, at *2 (E.D. Pa. Aug. 17, 2006) ("The Supreme Court has determined that the time limitations of Rule 29 and Rule 33 are 'claim-processing rules' . . . ." (quoting *Eberhart*, 546 U.S. at 19)).

consider a motion for acquittal that is untimely." 700 F.3d at 64.  But *Knight*'s disposition—affirming the district court's denial of the Rule 29 motion—suggests that the appellate court used the term "jurisdiction" in a loose sense, as many courts have over the years.  *See Kontrick*, 540 U.S. at 454 ("Courts, including this Court, . . . have been less than meticulous" in using the term "jurisdiction").

Even if *Knight* had used "jurisdiction" in the strict, technical sense, the Court need not follow that dictum.  For the proposition that an untimely Rule 29 deprives a district court of jurisdiction, *Knight* cited a single case—*United States v. Gaydos*, 108 F.3d 505 (3d Cir. 1997).  *See* 700 F.3d at 64.  *Gaydos*, in turn, relied exclusively on *Carlisle v. United States*, 517 U.S. 416 (1996).  In *Carlisle*, the Supreme Court considered "whether a district court ha[d] authority to grant a postverdict motion for judgment of acquittal filed one day outside the time limit prescribed by Federal Rule of Criminal Procedure 29(c)." 517 U.S. at 417–18.  Interpreting the then-operative language in Rule 45(b)(2), which prohibited district courts from extending the time for a Rule 29 motion, the Court held that the district court lacked authority to grant an untimely Rule 29 motion.  *See id.* at 420–21, 433.  Though *Carlisle* said nothing about jurisdiction, *Gaydos* read that case as treating Rule 29's time limit as jurisdictional.  *See* 108 F.3d at 512.  The Supreme Court, however, later clarified that its "holding in *Carlisle* did not 'characterize Rule 29 as jurisdictional.'" *Eberhart*, 546 U.S. at 18 (alteration and some internal quotation marks deleted).  To the contrary, it analogized to *Carlisle* in holding that Rule 33's time limits were claim-processing rules.  *See id.*

Rule 29's time limits are claim-processing rules and thus do not deprive the Court of jurisdiction to consider Spruell's motions.  That said, the government has

neither forfeited nor waived the timeliness issue, and Spruell fails to offer any reason—let alone good cause—for his late motions. *See* (Gov't Second Resp. 5–6); (Gov't Third Resp. 7–8, ECF No. 439). The Court must therefore deny Spruell's motions as untimely. *See Hamer*, 138 S. Ct. at 18 ("Claim-processing rules ensure relief to a party properly raising them, but do not compel the same result if the party forfeits them." (alterations and quotation in original omitted)); *id.* at 18 n.3 (reserving "whether mandatory claim-processing rules may be subject to equitable exceptions"); *Knight*, 700 F.3d at 64 (affirming the district court's denial of defendant's Rule 29 motion as untimely).

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.