**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

    v.

ANTOINE CLARK, et al,

CRIMINAL ACTION
NO. 19-15-1, 2, 4

**Pappert, J.**                                                                        **August 13, 2025**

**<u>MEMORANDUM</u>**

In 2020 a jury convicted Daniel Robinson, Antoine Clark and Gerald Spruell for various drug crimes.  As the Court explained in its post-trial opinion, the government's evidence showed that the three defendants and their confederates ran a "drug delivery service" that operated like a "pizza delivery service."  *See United States v. Clark*, No. CR 19-00015-1, 2020 WL 5269625, at \*1–4 (E.D. Pa. Sept. 3, 2020).  The Court sentenced each defendant to a lengthy term of incarceration.  All three now move the Court pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct their sentences, raising more than a dozen claims in all.  The government responded to each claim on the merits and did not argue that any were procedurally defaulted.  For the reasons that follow, the Court denies the motions.

I

A

Section 2255 permits a prisoner sentenced by a federal court to "move the court which imposed the sentence to vacate, set aside or correct the sentence" where (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to

1

collateral attack.  28 U.S.C. § 2255(a).  If the Court finds any of these conditions met, it

may, as appropriate, vacate the judgment, resentence the prisoner or grant the prisoner

a new trial.  *Id.* § 2255(b).  Because the three Defendants are proceeding *pro se*, the

Court liberally construes their filings "with an eye toward substance, rather than form."

*United States v. Delgado*, 363 Fed.Appx. 853, 855 (3d Cir. 2010) (citing *United States v.*

*Miller*, 197 F.3d 644, 648 (3d Cir. 1999)).

A court may only deny a § 2255 motion without an evidentiary hearing if "the

motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief."  28 U.S.C. § 2255(b).  So the Court must take all the prisoner's

"nonfrivolous factual claims" as true and then determine whether the existing record

conclusively forecloses his claim for relief.  *United States v. Dobbin*, --- F.4th ----, slip op

at *11–12 (3d Cir. Aug. 11, 2025) (quoting *United States v. Arrington*, 13 F.4th 331, 334

(3d Cir. 2021)).  If the prisoner's claims are not foreclosed by the existing record, the

Court must hold an evidentiary hearing regardless of whether the prisoner or

government has requested one.  *United States v. Tolliver*, 800 F.3d 138, 141–42 (3d Cir.

2015).  The record forecloses the Defendants

B

Most of the defendants' claims sound in ineffective assistance of counsel.  To

establish ineffective assistance, a prisoner must show that (1) his "counsel's

performance was deficient," meaning it fell "below an objective standard of

reasonableness," and (2) he suffered prejudice, meaning there's "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).

Under the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). Counsel cannot be ineffective for failing to pursue a meritless claim. *See United States v. Bui*, 795 F.3d 363, 366–67 (3d Cir. 2015).

II

A

Robinson claims his lawyer was ineffective in three ways. His most complicated claim is that his lawyer should have argued that his prior Pennsylvania convictions for possession of cocaine with intent to distribute were not "serious drug offenses" under 18 U.S.C. § 924(e)(2)(a)(ii). Had Robinson's lawyer made that argument and succeeded, Robinson's mandatory minimum sentence would have been ten years instead of twenty-five. (Robinson Petition 31–35); 21 U.S.C. § 841(b)(1)(A).[1] The government counters that such an argument would have been meritless because his state convictions were indeed serious drug offenses,[2] and the Court agrees.

---

[1]    Robinson was convicted in this case under, *inter alia*, 21 U.S.C. § 846 (conspiracy to distribute controlled substances). *See* (PSR). His violation of § 846 would ordinarily have carried a mandatory minimum sentence of ten years. 21 U.S.C. §§ 846, 841(b)(1)(A); (PSR at 1). But if Robinson committed the offenses after two or more convictions for a "serious drug felony" became final, the mandatory minimum increases to twenty-five years. *Id.* § 841(b)(1)(A); (PSR ¶ 5, n.2). The term "serious drug felony" is defined at 21 U.S.C. § 802(58) as an offense that (1) is described in 18 U.S.C. § 924(e)(2) and (2) meets certain additional requirements. The additional requirements are not at issue — the only question is whether Robinson's Pennsylvania convictions are embraced by § 924(e)(2)(A)(ii)'s definition of "serious drug offense."

[2]    The government also correctly points out that even if Robinson were right that his mandatory minimum was only ten years and that his attorney's performance was deficient for failing to so argue, he would still be unable to establish prejudice because the Court's sentencing decision was not based on the mandatory minimum but rather on his advisory guideline range of 360 months to life and a modest downward variance that accounted for his personal characteristics. *See* (Tr. Sentencing Sept. 22, 2020 at 91:25–96:4 ECF No. 506). The Court nevertheless addresses Robinson's "serious drug offense" argument in full because his co-defendant, Clark, raises the same argument, and the government concedes that "the Court may have sentenced Clark to a lesser term of incarceration if there had been a lower mandatory minimum." (Gov. Resp. 4); *see also* (Tr. Sentencing Sept. 1, 2020 at 94:3–9, 103:8–12, 105:13–21).

First, however, the Court must assure itself that Robinson's claim is not mooted

by President Biden's commutation of his sentence from 324 months to 180 months,

(Exec. Grant of Clemency 15, ECF No. 651). *See Ellison v. Am. Bd. of Orthopaedic*

*Surgery*, 11 F.4th 200, 204–05 (3d Cir. 2021) (courts have independent obligation to

assure themselves of jurisdiction). The Third Circuit Court of Appeals has not opined

on whether and when a Presidential commutation might moot a prisoner's collateral

attack on his sentence. But the Sixth Circuit has, concluding that where, as here, a

prisoner's collateral challenge to his sentence would (if successful) result in a

mandatory minimum that is less than his commuted sentence, the challenge is not

mooted by the commutation. *Dennis v. Terris*, 927 F.3d 955, 957–61 (6th Cir. 2019);

*accord Madej v. Briley*, 371 F.3d 898, 899 (7th Cir. 2004).[3]

The specific argument Robinson says his counsel should have raised is that

Pennsylvania's schedule of controlled substances defines "cocaine" more broadly than

the federal schedule of controlled substances does. *See* (Robinson Petition 32.) This

argument purports to take advantage of the so-called "categorical approach" that courts

must take when determining whether a state offense qualifies as a "serious drug

offense" under § 924(e)(1)(A)(2)(ii). *See United States v. Brown*, 47 F.4th 147, 149–50

(3d Cir. 2022), *aff'd*, 602 U.S. 101 (2024). Under the categorical approach, courts look

---

[3]     The Fourth Circuit takes a different view. It holds that courts are powerless to disturb a
commuted sentence, so any collateral challenge to a prisoner's sentence is moot. *United States v.
Surratt*, 855 F.3d 218 (4th Cir. 2017) (en banc) (mem.); *Blount v. Clarke*, 890 F.3d 456, 462 (4th Cir.
2018). This view, however, is in tension with the general principle that a commutation merely
"abridges the enforcement of [a] judgment, but does not alter it qua judgment." *United States v.
Benz*, 282 U.S. 304, 311 (1931); *cf. Nixon v. United States*, 506 U.S. 224, 232 (1993) ("[T]he granting
of a pardon is in no sense an overturning of a judgment of conviction by some other tribunal.") Since
a commutation leaves in place the sentencing judgment of the court who rendered it, there seems no
reason why that court wouldn't retain its power to alter the judgment.

only at the *elements* of the state criminal statute the defendant violated and determine

whether that statute "criminalizes more conduct than its generic federal counterpart."

*Id.* at 149–50.  If so, no conviction for that state offense qualifies as a serious drug

offense.  *See id.* at 149.

The definition of "serious drug offense" includes offenses under state law that

involve possessing cocaine (as defined by the federal schedule) with intent to distribute.

21 U.S.C. § 924(e)(1)(A)(2)(ii).  And the relevant state offense here is possessing cocaine

(as defined by the Pennsylvania schedule) with intent to distribute.  *See* 35 Pa. Stat.

§ 870-113(a)(30).  So if Pennsylvania's definition of cocaine covers substances that the

federal definition does not, then the Pennsylvania crime of possessing cocaine with

intent to distribute covers conduct that is not a serious drug offense.

According to Robinson, Pennsylvania's definition is broader than the federal

definition because the state definition includes positional (or "constitutional"[4]) isomers[5]

of cocaine, while the federal definition includes only "optical and geometric isomers" of

---

[4]       Robinson uses the term "positional isomers," which appears in many statutes but is
apparently an imprecise term that refers to a subset of constitutional isomers.  *See United States v.
Phifer*, 909 F.3d 372, 376, 378 (11th Cir. 2018); *id.* at 387–88 (Jordan, J. Concurring); *United States
v. Holmes*, No. 21-CR-147, 2022 WL 1036631, at *7 (E.D.N.Y. Apr. 6, 2022).  The Court refers in its
analysis to constitutional isomers because, as explained below, the federal definition does not include
constitutional isomers, so Pennsylvania's statute is broader if it includes any constitutional isomer,
positional or otherwise.

[5]       "Isomers are molecules that share the same chemical formula but have their atoms
connected differently or arranged differently in space."  *United States v. Phifer*, 909 F.3d 372, 376
(11th Cir. 2018) (citing Kahn Academy); *accord United States v. Ammar* 714 F.2d 238, 262 (3d Cir.
(1983) ("Isomers are substances with the same chemical composition but different structural
arrangement."); *Chamu v. U.S. Att'y Gen.*, 23 F.4th 1325, 1330 (11th Cir. 2022) (Isomers have "the
same formula but a different arrangement of atoms in the molecule and different properties.") (citing
*New Oxford American Dictionary* 921 (3d ed. 2010)).  In simpler terms, isomers "are chemicals made
from the same number and type of elements combined in different ways."  *Chamu*, 23 F.4th at 1330.

cocaine.[6]  (Robinson Petition 32.)  The argument mirrors one that recently has

succeeded in other federal courts.  *See, e.g.*, *United States v. Myers*, 56 F.4th 595, 597–

99 (8th Cir. 2022); *United States v. Minter*, 80 F.4th 406, 410–412 (2d Cir. 2023); *United*

*States v. Ruth*, 966 F.3d 642, 645–48 (7th Cir. 2020).  Initially, the government points

out that unlike the state statutes in those cases — which either defined cocaine to

include all isomers or specifically listed positional isomers — Pennsylvania's definition

of cocaine does not explicitly include any isomers at all.  *See* 35 P.S. § 780-104(2)(i)(4).

That's true, but the Pennsylvania Superior Court has nevertheless held that the state

definition of cocaine does include at least some cocaine isomers, *Commonwealth v.*

*Slyman*, 483 A.2d 519, 524–25 (Pa. Super. 1984), a holding this Court cannot ignore, *see*

*United States v. Taylor*, 596 U.S. 845, 859 (2022) ("[S]tate courts [are] the final arbiters

of state law in our federal system.").[7]

---

[6]      The Court must use the drug schedules in effect at the time the defendant committed the state offenses.  *Brown v. United States*, 602 U.S. 101, 106 (2024).  Robinson committed his offenses in 2001 and 2005.  *See* (Gov. Trial Ex. 301-7 &301-8, ECF No. 639-1).  Cocaine's "geometric and optical isomers" have appeared in Schedule II since Congress added them in 1984.  *See* Pub. L. No. 98-473, § 507 (1984); 21 U.S.C. § 812, Schedule II(a)(4); *see also* 21 C.F.R. §§ 1308.02, 1308.12(b)(4) (effective April 23, 1986).

     The relevant definition from Pennsylvania's schedule of controlled substances (which has remained unchanged since at least 1984, *see Commonwealth v. Slyman*, 483 A.2d 415, 523 n.7 (Pa. Super. 1984), is as follows:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.

> 35 Pa. Stat. § 780-104(2)(i)(4); *see also* 28 Pa. Code § 25.72(c)(1)(iv).

[7]      Reliance on a single decision of an intermediate appellate court for a rule of state law is appropriate here because the Pennsylvania Supreme Court hasn't spoken to the relevant issue, nor has any other intermediate appellate court in Pennsylvania.  *Singh v. Att'y Gen.*, 839 F.3d 273, 283 n.5 (3d Cir. 2016).

*Slyman*, however, leaves unclear whether Pennsylvania's definition reaches *constitutional* isomers of cocaine. *Slyman*'s strict holding is that where the prosecution's evidence establishes that the substance in question is either "the naturally occurring L-cocaine" (derived from coca leaves) or the "synthetically producible form . . . known as D-cocaine," the substance is embraced by § 780-104's definition of cocaine. *Id.* at 524. The *Slyman* Court also made a broader pronouncement (though arguably *dicta*) that it "reject[s] in its entirety" the "theory that [§ 780-104] only [embraces] those isomers of cocaine which are the natural product of the coca leaf and their chemical equivalents," and instead reads that section to "embrace those . . . which are susceptible of synthetic derivation." *Id.* at 528, 524.

While *Slyman* could be interpreted to say that the Pennsylvania definition of cocaine embraces *all* cocaine isomers, a closer reading reveals that the Superior Court contemplated only "eight distinct isomers of cocaine." *Id.* at 524. Courts writing at the time *Slyman* was decided frequently made similar references to the eight "known" cocaine isomers.[8] Those familiar eight are natural cocaine and its seven *stereo*isomers (more specifically, its one optical and six geometric isomers), not *constitutional* isomers.[9] *See United States v. Wilkes*, 78 F.4th 272, 280–85 (6th Cir. 2023); *Chamu*, 23

---

[8]    *See, e.g., United States v. Ortiz*, 610 F.2d 280, 281–82, 282 n.4 (5th Cir. 1980); *United States v. Bockius*, 564 F.2d 1193, 1195 n.2 (5th Cir. 1977); *United States v. Francesco*, 725 F.2d 817, 820 (1st Cir. 1984); *Best v. State*, 556 A.2d 701, 712 (Md. Ct. App. 1989); *Leavitt v. State*, 369 So.2d 993, 994 (Fla. Ct. App. 1979); *see also Minter*, 80 F.4th at 412 (observing that other isomers "were known to exist" in 1978 but not identifying any court opinions so stating at the time).

[9]    Stereoisomers are isomers whose atoms have the same connectivity but different spatial arrangement — the atoms are "linked in the same order, but each chemical's 3D shape is slightly different." *Chamu*, 23 F.4th at 1220 (citing *New Oxford American Dictionary* 1709 (3d ed. 2010)); *accord Minter*, 80 F.4th at 410; *Phifer*, 909 F.3d at 377–78; *Stereoisomerism*, IUPAC Compendium of Chemical Terminology, 5th ed. International Union of Pure and Applied Chemistry; 2025. Online version 5.0.0, 2025 ("IUPAC Compendium). Geometric and optical isomers, which the federal definition of includes, are types of stereoisomers. *Wilkes*, 78 F.4th 272 at 284–85; *Chamu*, 23 F.4th

F.4th at 1330.  So *Slyman* does not resolve whether § 780-104 embraces constitutional

isomers of cocaine — of which there are apparently several thousand, *see Alexis v. Barr*,

960 F.3d 722, 728 (5th Cir. 2020); *United States v. Boyce*, No. 21-CR-777 (LJL), 2022

WL 2159890, at *4 (S.D.N.Y. June 15, 2022).[10]

The text of § 780-104 and the Superior Court's decision in *Slyman* thus create, at

most, ambiguity.  In these circumstances, the Court may not conclude that § 780-104

reaches constitutional isomers by "application of legal imagination."  *Gonzales v.*

*Duenas-Alvarez*, 549 U.S. 183, 193 (2007); *see also Baghdad v. Att'y Gen. of U.S.*, 50

F.4th 386 (3d Cir. 2022).  Rather, Robinson has to show a "*realistic* probability, not a

theoretical possibility" that Pennsylvania would "actually prosecute[]" individuals for

trafficking constitutional isomers of cocaine.  *Moncrieffe v. Holder*, 569 U.S. 184, 206

(2013) (emphasis added).  To do so he may either show that he was so prosecuted or

that others have been.  *Duenas-Alvarez*, 549 U.S. at 194.  Robinson has made no such

showing.

---

at 1330–31.  Constitutional isomers are isomers whose atoms differ in their "connectivity" and "line formulae" — "e.g., $CH_3OCH_3$ and $CH_3CH_2OH$."  *Constitutional Isomerism*, IUPAC Compendium; *see also Phifer*, 909 F.3d at 378.

[10]      As mentioned, several federal courts have recently considered state statutes that define "cocaine" to include its "isomers," without specifying any sub-types of isomers.  *See, e.g., Minter*, 80 F.4th at 410 (interpreting New York's schedule of controlled substances).  Those courts have interpreted the statute's use of "isomers" to include *all* isomers, including constitutional ones, even though that interpretation sweeps in many thousands of substances.  *See id.* at 410–412.  Some of the language in *Slyman* arguably is similarly broad.  *See* 483 A.2d at 426 ("[T]he statute's prohibitory sweep is sufficiently wide so as to embrace those varieties of cocaine which are susceptible of synthetic derivation."); ("[W]e have rejected in its entirety appellant's theory that the Act only prohibits those isomers of cocaine which are the natural product of the coca leaf and their chemical equivalents.")  But courts don't interpret judicial opinions the same way they interpret statutes.  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979); *Nevada v. Hicks*, 533 U.S. 353, 372 (2001).  Since *Slyman* contemplates only the eight familiar stereoisomers, the opinion is not dispositive with respect to the thousands of constitutional isomers.

B

Robinson's two remaining ineffective-assistance claims are less involved.  First,
he says that his lawyer should have raised a Confrontation Clause challenge to the
admission of Title III wiretap recordings of purchasers buying drugs from the
Defendants.  (Robinson Petition 20–21.)[11]  But such an objection would have been
meritless because "surreptitiously monitored conversations . . . are not 'testimonial.'"
*United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005).

Second, Robinson says his lawyer should have discovered that Philadelphia
Police Officer Gregory Stevens — one of the government's witnesses — was on the scene
when Robinson was arrested in 2005 and that the 2005 arrest was the subject of an
internal-affairs investigation.  (Robinson Petition 26–30.)[12]  Robinson says his lawyer
could have impeached Officer Stevens with this information after Stevens testified that
he did not know of Robinson until January of 2014 (when Stevens began surveilling
him and his co-conspirators).  *See* (*id*. 27–28; (Tr. Jury Trial Feb. 19, 2020 at 167:19–
168:2, ECF No. 392).  And if Stevens had been so impeached, Robinson says, then the
jury would have disbelieved his testimony "about Robinson's movements and alleged
drug transactions during the . . . conspiracy" and his testimony "interpret[ing] . . .
phone intercepts."  (Robinson Petition 26.)

---

[11]     Robinson also suggests on these and other pages that his lawyer was ineffective for failing to
challenge the allegedly improper aggregation of drug weights.  *See* (Robinson Petition 21–23).  But
his lawyer did make that argument, and both this Court and the Court of Appeals rejected it.  *Clark*,
2020 WL 5269625, at *5; *United States v. Clark*, No. 20-2876, 2023 WL 2400741, at *2 (3d Cir. Mar.
8, 2023).

[12]     Robinson says in his petition that Stevens was the one who arrested him, but the arrest
report and an internal-affairs interview on which he relies show that Stevens was not the arresting
officer and only saw Robinson for a couple of seconds.  *See* (Robinson Petition 36–38).

Even assuming that the failure to discover the prior arrest records and impeach

Officer Stevens with those records constituted deficient performance, Robinson suffered

no prejudice as a result.  Stevens was a relatively minor witness — his testimony

occupied less than half a day of the government's eight-day presentation, and much of

the testimony concerned defendants other than Robinson.  *See* (Tr. Jury Trial Feb. 19,

2020 at 105–169).  The Government also didn't mention Stevens at all during its

closing.  *See* (Tr. Jury Trial Feb. 21, 2020 at 11–41, ECF No. 394).  And Stevens told the

jury that he didn't listen to the wiretap recordings, (*id.* at 159:13–23), so it's not clear

why Robinson thinks Stevens's testimony helped the jurors understand them.

The other evidence the government used to connect Robinson to the conspiracy

was far more important than anything Stevens said.  That evidence included testimony

by a co-defendant, *see, e.g.*, (Tr. Jury Trial Feb. 13 at 153:12–155:8, ECF No. 389), and

by the case's lead FBI investigator, *see, e.g.*, (Tr. Jury Trial Feb. 14 at 191:25–193:22,

ECF No. 390), and wiretap recordings of Robinson talking to buyers and agreeing to sell

them drugs, *see, e.g.*, (*id.* at 183:16–184:5).  So even if the jury believed nothing Stevens

said about Robinson, there's no reasonable probability that it would have reached a

different verdict.[13]

---

[13]     He also argues that the government's lawyers violated their obligation to disclose material
evidence under *Giglio v. United State*s, 405 U.S. 150 (1972) and *Brady v. Maryland*, 373 U.S. 83
(1963), and their obligation to correct testimony they know to be false under *Napue v. Illinois*, 360
U.S. 264 (1959).  That argument fails for the same reason as the ineffective-assistance argument.  A
lawyer only violates *Napue* and/or *Brady* and *Giglio* if the evidence in question was "material," and
the materiality standard is the same as the prejudice standard under *Strickland*.  *Marshall v.
Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002).

10

C

Robinson also seeks leave to amend his petition so that he may add a claim that

his lawyer was ineffective for failing to seek a downward departure of one year

pursuant to U.S.S.G. § 5K2.23.  (Robinson Mot. for Leave 1–2, ECF No. 662.)  This

claim is mooted by President Biden's commutation of Robinson's sentence from 324

months to 180 months.  (Executive Grant of Clemency 15.)  The Court "may not alter a

President's commutation."  *Dennis*, 927 F.3d at 960.  So all it could do is alter its own

judgment of 324 months' imprisonment to 312 months.  Since Robinson's commuted

sentence is far shorter than 312 months, his proposed § 5K2.23 claim wouldn't permit

the Court "to grant any effectual relief whatever" even if it succeeded.  *Knox v. Serv.*

*Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (cleaned up).

And even if this claim wasn't moot, the Court would deny leave to amend

anyway.  Courts should permit leave to amend when "justice so requires."  *United*

*States v. Duffus*, 174 F.3d 333 (3d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)).  Justice

does not require granting leave when the proposed amendment would be futile — that

is, when the amended pleading would fail to set out grounds for relief.  *See In re*

*Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

Robinson's proposed amendment would be futile.  Section 5k2.23 provides that a

downward departure may be appropriate if the defendant already served a sentence of

imprisonment for a past offense that constitutes "relevant conduct to the instant

offense."  U.S.S.G. §§ 5K2.23, 5G1.3.  Robinson here served a year in prison for a 2014

state offense that was relevant conduct to his federal conspiracy conviction.  (PSR ¶ 130

n.13.)  Yet § 5K2.23 further provides that "[a]ny such departure should be fashioned to

achieve a reasonable punishment for the instant offense." A departure based on Robinson's 2014 sentence would not have been reasonable.

When the Court imposed Robinson's sentence, it took account of the fact that Robinson had served prior sentences for drug-trafficking convictions, including the 2014 conviction. *See* (PSR ¶¶ 199–120); (Tr. Sentencing Sept. 22, 2020 at 81:5–13). The Court explained that those prior sentences had failed to instill in Robinson any meaningful respect for the law, and that lack of respect appeared to be why he became "one of the lead players" in the elaborate scheme underlying this case. (*Id.* at 95:2, 96:14–23.) The Court thus concluded that a substantial sentence was necessary to deter Robinson and to protect the public, and it found 324 months reasonable. (*Id.* at 97:17-21, 99:3-14, 100:16-21.)

Robinson thus cannot demonstrate, as he must, a "reasonable probability of any decrease in [his] sentence" had his lawyer made the argument he suggests. *United States v. Smack*, 347 F.3d 533 (3d Cir. 2003); *cf. United States v. Law*, No. CRIM.A. 08-77, 2012 WL 1671289, at *4 (E.D. Pa. May 14, 2012) (no prejudice because the sentence imposed was reasonable and already a lenient one, so the court would have denied any departure or variance requests had they been made).

### III

Clark raises three claims in his petition. First, he contends his counsel was ineffective for failing to argue that the jury needed to make an "occasions inquiry" with respect to his prior convictions for "serious drug felonies." (Clark Petition 2, ECF No. 624); (Clark Reply 2–3, ECF No. 661). The phrase "occasions inquiry" comes from court decisions interpreting a provision of the Armed Career Criminal Act that increases a

defendant's mandatory minimum sentence if he committed certain prior offenses "on occasions different from one another."  *See Erlinger v. United States*, 602 U.S. 821, 834–35 (2024) (quoting 18 U.S.C. § 924(e)(1)).  But unlike ACCA, the provision setting the applicable penalties for Clark's convictions contains no requirement that his prior offenses occur on different occasions.  *See* 21 U.S.C. § 841(b)(1)(A).

Second, he argues that his counsel was ineffective for failing to argue that pursuant to *Alleyne v. United States*, 570 U.S. 99 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the jury (not the judge) had to find that the maximum sentence for his prior drug-trafficking convictions was ten years or more.  (Clark Petition 3); *see* 21 U.S.C. §§ 841(b)(1)(A) 802(58).  The government argues that the *Almendarez-Torres v. United States*, 523 U.S. 224 (1998) exception to *Alleyne* and *Apprendi* — which permits a judge to find "the fact of a prior conviction," *see Erlinger*, 602 U.S. at 838 — also permits a judge to find the maximum sentence for that conviction.  (Gov. Resp. 7.)  But even assuming that the *Almendarez-Torres* exception does not apply, Clark suffered no prejudice by his lawyer's failure to insist that the jury find the maximum sentences.  The government's uncontroverted evidence showed that Clark had been convicted three times for possession of cocaine with intent to deliver in violation of 35 Pa. Stat. § 780-113(a)(30).  *See* (Gov. Trial Ex. 301-1–301-3, ECF No. 638-1.)  The maximum sentence for all three crimes was ten years.  *Id.* at § 780-113(f)(1.1) (eff. Jan. 2005 to April 2010).  No reasonable jury could have found otherwise.

Third, Clark argues that his lawyer was ineffective for failing to argue that his cocaine-trafficking convictions were not serious drug felonies because Pennsylvania's schedule of controlled substances defines cocaine more broadly than the federal

schedule.  (Clark Petition 3); (Clark Reply 3–5.)  But such an argument would have

failed, as the Court explained *supra* Part II.A.

IV

Spruell raises more than a dozen different claims in his petition.  In the first

several, he contends that his lawyer was ineffective for failing to raise certain

arguments, even though his lawyer did so.  He says counsel was ineffective for failing to

object to "the amount of heroin attributed to [him]" in the PSR,[14] the firearm

enhancement under U.S.S.G. § 2D1.1(b)(1), and calculation of his criminal-history score

(Spruell Petition 24, ECF No. 625), but his lawyer made all those objections, (PSR at

46–49).  He next says that his lawyer should have challenged "the reliability of the

confidential informants used by the government," (Spruell Petition 25), but his lawyer

cross-examined the government's witnesses extensively about the informants, *see, e.g.*,

(Tr. Jury Trial Feb. 11, 2020 at 9:8–19:5, ECF No. 387).  He also faults his lawyer for

not cross-examining the informants, (Spruell Petition 25), but the informants never

testified.

He next says that his lawyer should have "challenge[d] the application of the [28

U.S.C. § 851] enhancements," (Spruell Petition 25), but his lawyer did so on appeal and

the Third Circuit held that the errors Spruell's lawyer identified were harmless, *Clark*,

2023 WL 2400741, at *3 n.8.  He says his lawyer "did not present sufficient mitigating

evidence at sentencing," (Spruell Petition 26), but his lawyer presented five mitigation

---

[14]     Spruell also says that his lawyer should have argued that the drug-weight calculations in the
PSR violated *Apprendi* and *Alleyne* because they were found by a judge and not a jury.  (Spruell
Petition 24); (Spruell Reply 2–4, ECF No. 646.)  The drug-weight calculations in the PSR were
relevant only to the calculation of his advisory guidelines range, not his mandatory minimum or
maximum sentence, so *Apprendi* and *Alleyne* do not apply.

14

witnesses, (Tr. Sentencing Nov. 9 2020 at 56:4–69:16, ECF No. 495), and Spruell does

not specify any additional evidence that should have been presented.  Finally, he says

his lawyer should have requested a jury instruction explaining that the jury must find

"beyond a reasonable doubt that Mr. Spruell knowingly and intentionally joined the

conspiracy," (Spruell Petition 26), but the Court gave such an instruction, (Tr. Jury

Trial Feb. 21, 2020 at 135:8–13, ECF No. 394).

Spruell next raises several meritless claims under a heading titled "prosecutorial

misconduct."  He says the prosecution presented records of his prior convictions without

authenticating them, (Spruell Petition 26), but those records were self-authenticating,

*see* Fed. R. Ev. 902(2); *see also* (Tr. Jury Trial Feb. 24, 2020 50:12–51:14, ECF No. 395).

He also says that counsel for the government made unfairly inflammatory statements

in closing — namely, calling him a "major drug dealer" and suggesting that he was

"responsible for the overall drug problem in the community."  (Spruell Petition 27.)

Neither of those phrases actually appear in the government's closing.  And even if they

did, those statements would not have "infected the trial with unfairness," *Donnelly v.*

*DeChristoforo*, 416 U.S. 637, 643 (1974), because Spruell was on trial precisely for his

participation in a major drug-dealing conspiracy.

Interspersed among the above claims are several cursory allegations that are too

vague to constitute legitimate grounds for relief.  He says that his lawyer did not

identify "key witnesses who could have provided exculpatory testimony" and

"significant evidence that could have undermined the prosecution's case," but he doesn't

offer any specifics.  (Spruell Petition 24–25.)  He also says the government failed to

disclose "significant information about the informants' backgrounds and motivations,"

"information about the unreliability of the . . . informants," and "evidence that could have contradicted the prosecution's estimates of drug quantities," though again he includes no meaningful information.  (*Id.* at 27.)  And he says the government "may have fabricated or manipulated evidence to strengthen [its] case," again without specifics.  (*Id.*)

Spruell next argues that the Court improperly applied the Sentencing Guidelines in various ways.  He says "[t]he drug quantities attributed to [him] were inflated and not supported by credible evidence" but rather resulted from "flawed extrapolation methods."  (Spruell Petition 28.)  Spruell's lawyer made the same argument to the Court of Appeals, which rejected it.  *See Clark*, 2023 WL 2400741, at *3 n.6.  He also says his sentence reflects unwarranted disparities between his codefendants and "other defendants involved in similar drug conspiracies" and does not reflect proper consideration of mitigating circumstances like his "difficult upbringing."  (Spruell Petition 28–30.)  These conclusory statements, in addition to being vague, fail to recognize that the Court took account of these factors when it fashioned Spruell's sentence in 2020.  *See* (Tr. Sentencing Sept. 9, 2020 at 106:10–18, 100:11–19, ECF No. 495).  Finally, Spruell argues that the Court erred in applying the career-offender provision at U.S.S.G. § 4B1.1, but as the Court of Appeals explained on direct appeal, Spruell's guidelines-range calculation was not based on § 4B1.1.  *Clark*, 2023 WL 2400741, at *4.

V

A certificate of appealability (COA) should only be issued if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

16

§ 2253(c)(2).  The petitioner must "demonstrate that reasonable jurists would find the District Court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  None of the Defendants has made such a showing, so no certificate should issue.

An appropriate Order follows.

BY THE COURT:

***/s/ Gerald J. Pappert***

Gerald J. Pappert, J.

17